## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MIRJAM LETSCH,

       *Plaintiff*,

  v.

SOUTHERN PROPER HOSPITALITY
GROUP, LLC, et al.,

       *Defendants*.

Civil Action No. 21-1840 (TJK)

## <u>MEMORANDUM OPINION</u>

Mirjam Letsch is a professional photographer who took the photo below that caught the eye of those planning to open Gypsy Kitchen, a restaurant in Atlanta, Georgia.



ECF No. 1-1. Gypsy Kitchen paid Letsch to use the photo as a mural on one of the restaurant's walls. Years later, the owners of Gypsy Kitchen opened another such restaurant in Washington, D.C. and used the photo in the same way. Letsch demanded to be compensated, but the owners refused, asserting that they had already purchased a license to use the photo. This suit for copyright

infringement followed.  The parties now cross-move for summary judgment.  The Court will grant in part Letsch's motion, as far as it seeks to establish Defendants' liability for copyright infringement related to the photo's use in Gypsy Kitchen's D.C. restaurant and her entitlement to actual damages and any profits related to that infringement.  The Court will deny her motion as far as it seeks an exact amount of those damages, and to the extent it seeks liability related to the photo's use in the Atlanta restaurant.  Conversely, the Court will grant in part Defendants' motion, to the extent it seeks to establish their lack of liability for infringement related to the photo's use in the Atlanta restaurant and as far as the motion seeks judgment on Letsch's request for statutory damages under 17 U.S.C. § 504(c)(1), which Letsch herself concedes are improper.  The Court will otherwise deny Defendants' motion.

## I.   Background

Mirjam Letsch is an experienced professional photographer residing in the Netherlands. ECF No. 39-1 ¶ 29.  In 2007, she took a photo, which she titled, "Portrait of a woman from the Bhopa tribe in the Indian desert state of Rajasthan, drinking chai (traditional masala tea)."  *Id.* ¶¶ 1–2.  In 2021, she registered that photo with the United States Copyright Office.  *Id.* ¶ 3.

Southern Proper Hospitality Group, LLC ("SPHG") is an Atlanta-based hospitality business that owns and operates several restaurants.  ECF No. 39-1 ¶ 31.  Chris Hadermann is SPHG's managing partner.  *Id.* ¶ 33.  In 2014, SPHG began planning to open a new restaurant, the "Gypsy Kitchen," in Atlanta, Georgia.  *Id.* ¶ 4.  They employed an architecture firm, Lacina Heitler Architects ("LHA"), to design and build the restaurant.  *Id.* ¶ 5.  Several years later, SPHG began planning a second Gypsy Kitchen in Washington, D.C.  *Id.* ¶ 22.  This time, they employed RDstudio Drafting Services, Inc., as the architect for the project.  *Id.* ¶ 23.

As plans to open the first Gypsy Kitchen in Atlanta were underway, Matthew Buyer, an LHA employee, contacted Letsch through her website.  ECF No. 39-1 ¶¶ 37–38.  He asked about

2

purchasing the digital image and using it "as a permanent large feature (wall mural)" for one of LHA's projects.  ECF No. 33-7.  He added, "I'm uncertain on what usage terms and categories it should be considered as in the online order form."  *Id.*  And he asked Letsch, "[c]an you help give us a sense of what using this image may cost and how we could purchase it?"  *Id.*

Letsch responded the same day asking for more details, such as "in what kind of a location will the wall mural be?  Size?"  ECF No. 33-8.  She also explained that "[t]he image is model-released, so no problem using it."[1]  *Id.*  Buyer replied that LHA hoped to use Letsch's image in a restaurant LHA was designing in Atlanta.  ECF No. 39-1 ¶ 7.  The photo was to be used "as a large mural on one of their dining room walls."  ECF No. 33-9.  He added that the "desired size is approximately 14'x14'" and that "we were planning on printing it on a thick wall covering type vinyl."  *Id.*  But Letsch needed additional clarification; it was unclear to her whether Buyer "would like to use the photo one time (mural **or** vinyl) or twice (mural **and** vinyl)."  ECF No. 33-10.  Buyer clarified that "[w]e plan to use it only once as a large format vinyl print @ 4m x 4m" and that he "described it previously as a mural because it will be 'mural' size."  *Id.*

With those clarifications, Letsch wrote to Buyer, "[i]f you use my photo only for the 'mural' as specified by you, I can offer you the (model released) photo at € 1000."  ECF No. 33-11.  After Buyer got confirmation from SPHG to proceed, *see* ECF No. 37-5, Letsch and Buyer worked out final details, such as the method of payment and file transfer, *see* ECF No. 33-12, 33-13.  Among other questions, Buyer asked, "[h]ow do you grant the license?  Do you want to provide a written document?"  ECF No. 33-12.  Letsch responded, "[w]hatever is convenient for you.  I have a model release, signed by the woman, here with me."  ECF No. 33-13.

---

[1] A "model release" is an agreement signed by the subject of a photograph that allows the photographer to publish or otherwise commercialize the image.  *See Tharpe v. Lawidjaja*, 8 F. Supp. 3d 743, 779 (W.D. Va. 2014) (defining "model release").

A few days later, Hadermann sent Letsch a payment of €1000 via PayPal.  ECF No. 33-15.
Letsch then sent the photo, an invoice, and the model release to Buyer.  ECF No. 33-14.  The
model release confirmed that the subject of Letsch's photo had permitted Letsch to use the photo
for any purpose.  ECF No. 33-16.  Meanwhile, the invoice included a note stating, in all caps,
"PHOTO TO BE USED FOR RESTAURANT MURAL (ONLY)."  ECF No. 33-17.  It also stated,
"[f]or all other use: please contact me first."  *Id.*  Buyer confirmed receipt of the image and docu-
ments and thanked Letsch "for creating such a striking photo and giving us permission to use it."
ECF No. 33-14.  Over the next few years Letsch's photo was included in many of Gypsy Kitchen's
social media posts and promotional materials.  *See, e.g.*, ECF No. 37-25 (Gypsy Kitchen's Face-
book cover photo), 37-26 (compilation of social media posts and promotional materials incorpo-
rating Letsch's photo).

Years later, SPHG decided to open another Gypsy Kitchen in Washington, D.C.  *See* ECF
No. 39-1 ¶ 92.  Hadermann contacted Josh Heitler of LHA to ask about "the Gypsy Mural," saying,
"I was trying to find the string about us licensing the photo, I was unsure if we could use it again
for DC, so I thought I would check with you and see if you remembered who/how we were able
to get the rights to use?"  ECF No. 37-9 at 3.  In response, Heitler forwarded the invoice and the
model release, noting that the two documents led him "to believe we might need to reach out to
them again to license it for another location but there may be some room for interpretation."  *Id.*
at 2.  Hadermann, "being a little bit cheeky," ECF No. 37-4 at 7, responded, "[h]aha, exactly, my
interpretation is, it's still being used for a 'restaurant mural only':),"  ECF No. 37-9 at 2.  In a
separate email, Hadermann explained, "I feel like the language on the licensing, does allow for a
restaurant mural use, which this is, so I feel like this could be interpreted ok?"  *Id.* at 9–10.

Later, RDstudio—the design firm hired this time around by SPHG—emailed Letsch: "We are working on a restaurant in DC with Southern Proper Hospitality.  In 2014 they had been given permission by you to use the image for mural use only.  Can we use the image again for the new location?"  ECF No. 33-27.  Letsch and RDstudio's representative exchanged several emails and appeared to agree on €1,200 for permission to use the photo at the D.C. location, until RDstudio's representative suddenly stopped responding.  *See* ECF No. 37-14.  Eventually, Letsch followed up, "[y]ou haven't paid the invoice, have not cancelled, nothing.  Please let it be clear that my photo cannot be used in any way in another project.  Not as as [*sic*] mural, not in print or digital."  ECF No. 37-15 at 2.  RDstudio's representative forwarded that email to Hadermann, noting, "[y]ou've asked us to ignore her invoice and stop communication with her since you felt that the image was already purchased by SPH and in your original terms with her it didn't explicitly state that you couldn't reproduce the image."  ECF No. 37-17.  The email also asked how he wanted to handle the situation given that the improper use of a copyrighted image can expose them to a complaint.  *Id.*

Hadermann then emailed Letsch that "we have already paid you for the licensing and use of this image for our Gypsy Kitchen concept."  ECF No. 37-16 at 2.  Letsch asserted that he was mistaken, that they do not have an agreement because she only ever gave permission to use her photo as one mural in a single restaurant.  *Id.*  Hadermann simply responded, "Good Luck!"  *Id.*

A few months later, in response to an email from an RDstudio representative, Hadermann agreed "to proceed with using the original gypsy image that we have on file."  ECF No. 37-18 at 2.  Thus, a second mural was created and then displayed in the Washington, D.C. Gypsy Kitchen starting in August 2020.  ECF No. 39-1 ¶ 127.  In March 2021, Letsch's counsel sent Hadermann a letter demanding that SPHG and its agents and representatives cease and desist all unauthorized

uses of Letsch's photo, including by removing the mural from the D.C. restaurant.  *Id.* ¶ 96.  The mural was taken down about two months later.  *Id.* ¶ 97.

In July 2021, Letsch sued.  *See* ECF No. 1.  She brought a claim of direct copyright infringement against SPHG, Hadermann, RDstudio, and ABC Imaging of Washington, Inc., and a claim of contributory and vicarious copyright infringement against SPHG and Hadermann.[2]  *Id.* at 8–11.  She sought damages, costs, and an injunction precluding Defendants from further use of her photo.  *Id.* at 11.  After discovery was completed, the parties cross-moved for summary judgment.  *See* ECF Nos. 33, 35, 36.  Their dispute centers on whether Defendants' use of Letsch's photo fell within the license that they purchased—in other words, whether the license was limited to one mural in one restaurant.

## II.  Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the burden of showing the "absence of a genuine issue of material fact" in dispute.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "In determining whether there are genuine factual issues in dispute, [courts] must draw all reasonable inferences in favor of the nonmoving party."  *Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)).

"Evaluating whether evidence offered at summary judgment is sufficient to send a case to the jury is as much art as science."  *Estate of Parsons v. Palestinian Auth.*, 651 F.3d 118, 123 (D.C.

---

[2] In November 2021, the Clerk entered default against ABC Imaging of Washington, Inc., and this defendant is not party to the cross-motions here.  ECF No. 25.  Thus, the Court's use of the term "Defendants" throughout this Memorandum Opinion excludes ABC Imaging of Washington, Inc.

Cir. 2011).  This evaluation is guided by the principle that "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment."  *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (per curiam).  At the same time, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Lopez v. Council on Am.-Islamic Rels. Action Network, Inc.*, 826 F.3d 492, 496 (D.C. Cir. 2016) (quoting *Anderson*, 477 U.S. at 247–48).

## III.    Analysis

### A.    Defendants' Liability for Copyright Infringement

Letsch moves for summary judgment as to her claim for direct copyright infringement against Defendants.[3]  To establish copyright infringement, she must prove "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original."  *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991).  And third, "[t]he copying must be beyond the scope of a license possessed by the defendant."  *Stenograph LLC v. Bossard Assocs., Inc.*, 144 F.3d 96, 99 (D.C. Cir. 1998).  The parties do not dispute the first two elements: Letsch owns the copyright to the photo at issue, and Defendants copied and used the photo in several ways.  The parties only dispute the third element: whether the copying was "beyond the scope of [the] license possessed by the defendant[s]."  *Id.*

---

[3] Letsch's complaint also brings a claim against only SPHG and Hadermann for contributory and vicarious copyright infringement.  ECF No. 1 ¶¶ 56–63.  Contributory and vicarious infringement involve "intentionally inducing or encouraging direct infringement" and "profiting from direct infringement while declining to exercise a right to stop or limit it."  *MGM Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005).  In their briefing, the parties do not discuss these theories, and Letsch's motion refers only to Defendants' collective liability, with no distinction between SPHG, Hadermann, and RDstudio.  *See* ECF No. 35 ¶ 2 ("Defendants are liable, pursuant to 17 U.S.C. § 501(a), for infringing upon Plaintiff's exclusive copyrights in the Photograph that are protected under 17 U.S.C. § 106.").  The Court follows suit.

Thus, the Court must first determine the scope of the license conveyed by the contract between the parties.  Because the relevant facts—such as the content of the parties' communications—are undisputed, and the parties only contest their interpretation, "the issue is a purely legal one that may be decided by the Court on summary judgment."  *Fodere v. Lorenzo*, No. 09-CV-23120, 2011 WL 465468, at *4 (S.D. Fla. Feb. 4, 2011), *aff'd*, 441 F. App'x 666 (11th Cir. 2011) (copyright-infringement case determining scope of license on summary judgment).  After determining the scope of this license, the Court considers—and rejects—an alternative argument advanced by Defendants about the parties' agreement lacking a "condition precedent."  Finally, the Court determines which of Defendants' uses exceeded the scope of the license, and whether any of Defendants' uses were justified by a later implied license.

### 1.    The License's Scope

The parties do not dispute that Letsch granted Defendants *a* license to use her photo; they only dispute its scope.  In determining the scope of the license, the Court relies on state law to interpret the contract between the parties that granted the license.  *See Foad Consulting Grp., Inc. v. Musil Govan Azzalino*, 270 F.3d 821, 827 (9th Cir. 2001) ("State law," rather than federal copyright law, "determines whether a copyright holder has granted [a nonexclusive] license.").  Defendants argue from choice-of-law principles that Georgia law should apply.  *See* ECF No. 33-1 at 17–19.  And Letsch does not contest that point.  *See* ECF No. 36 at 21 n.3.  The Court agrees and applies Georgia's principles of contract construction and interpretation.[4]

---

[4] The Court would reach the same bottom-line conclusions even if it applied the law of the District of Columbia.  As Letsch observes, relevant contract law in these jurisdictions is similar.  *Compare Extremity Healthcare, Inc. v. Access to Care Am., LLC*, 793 S.E.2d 529, 534 (Ga. Ct. App. 2016), *with Henke v. U.S. Dep't of Com.*, 83 F.3d 1445, 1450 (D.C. Cir. 1996).  Determining whether an ambiguity exists also requires the same analysis in both jurisdictions.  *Compare Cap. Color Printing, Inc. v. Ahern*, 661 S.E.2d 578, 583 (Ga. Ct. App. 2008), *with Gryce v. Lavine*, 675 A.2d 67, 69 (D.C. 1996).

In Georgia, "[a] contract is an agreement between two or more parties for the doing or not doing of some specified thing." Ga. Code Ann. § 13-1-1. To establish the existence of a contract, "the plaintiff must prove three elements: the subject matter of the contract, consideration, and mutual assent to all the terms by the parties." *Trickett v. Advanced Neuromodulation Sys, Inc*., 542 F. Supp. 2d 1338, 1350 (S.D. Ga. 2008). Here, once again, the parties' dispute is narrow. The contract's subject matter (the photograph and corresponding license) and consideration (€1000) are not in dispute. The parties contest only the terms to which they assented.

"To determine whether the parties mutually assented to all essential terms of the contract, the circumstances surrounding the making of the contract, such as correspondence and discussions, are relevant in deciding if there was a mutual assent to an agreement." *Netsoft Assocs., Inc. v. Flairsoft, Ltd*., 771 S.E.2d 65, 67–68 (Ga. Ct. app. 2015) (quoting *Bedsole v. Action Outdoor Advert. JV, LLC*, 750 S.E.2d 445, 450 (Ga. Ct. App. 2013)). And in construing the terms agreed upon, the Court seeks "to ascertain the intention of the parties." *Gen. Steel, Inc. v. Delta Bldg. Sys., Inc.*, 676 S.E.2d 451, 453 (Ga. Ct. App. 2009) (citing Ga. Code Ann. § 13-2-3). When a written contract is ambiguous, or when only part of a contract is reduced to writing, the Court may rely on parol evidence. Ga. Code Ann. § 13-2-2(1). Otherwise, where language is unambiguous, the Court "simply enforces the contract according to its clear terms." *CareAmerica, Inc. v. S. Care Corp.*, 494 S.E.2d 720, 722 (Ga. Ct. App. 1997).

The parties point to different documents that they say reflect the scope of the license conveyed to Defendants. Defendants argue that the terms of the license were defined by the model release, which they interpret as granting them a nonexclusive right to "use, re-use, display, distribute, transmit, publish, re-publish, copy, or otherwise exploit, either in whole or in part, either digitally, in print, or in any other medium now or hereafter known" Letsch's photo. *See* ECF No. 33-

1 at 18, 22.  Letsch argues that the license was memorialized by the invoice.  ECF No. 36 at 26. The Court agrees with Letsch.  The terms of the license were first unambiguously established in email correspondence and then memorialized by Letsch's invoice, and those terms limited Defendants' use of her photograph to one mural in one restaurant.

The parties' communications and the invoice unambiguously support such a reading of the license.  An agent of SPHG asked to use Letsch's photo in a single restaurant in Atlanta, with no mention of other locations.  *See* ECF No. 33-9 ("We'd love to use this image in a restaurant we're designing in Atlanta[,] Georgia . . . on one of [the] dining room walls.").  In response to a question about how many times the photo would be used, that agent made clear that the photo would be used to create a single mural.  *See* ECF No. 33-10 ("We plan to use it *only once* as a large format vinyl print @ 4m x 4m." (emphasis added)).  And this was the only use to which Letsch agreed. *See* ECF No. 33-11 ("If you use my photo only for the 'mural' as specified by you . . . .").  Letsch confirmed this interpretation when she issued the invoice that reflected these terms: "PHOTO TO BE USED FOR RESTAURANT MURAL (ONLY)."  ECF No. 33-17.  The use of the singular words "restaurant" and "mural," coupled with the emphatic "only," support that the license Letsch conveyed was limited to a single mural in a single restaurant.  That conclusion is also buttressed by the invoice's instruction: "For all other use: please contact me first."  *Id.*  In short, Letsch's email exchange with an agent of SPHG shows the same thing the invoice reflects: the parties agreed on a limited license to use Letsch's photo one time in a single restaurant.

Defendants respond by pointing to one of Letsch's responses in the email exchange.  Letsch was asked, "[h]ow do you grant the license?  Do you want to provide a written document?"  ECF No. 33-12.  She responded, "[w]hatever is convenient for you.  I have a model release, signed by the woman, here with me."  ECF No. 33-13.  Defendants argue that "[t]he only reasonably [*sic*]

interpretation of the parties' correspondence is that the model release sets forth the bounds of the license." ECF No 33-1 at 18. Not so. After reviewing the complete email exchange and "the circumstances surrounding the making of the contract," *Netsoft*, 771 S.E.2d at 68, it is evident that Letsch was referring to having received the *model's* permission to use her likeness. The model release is unambiguously a contract between Letsch and the subject of her photo about the subject's publicity rights, not between Letsch and any defendant about the right to use the photo. *See* ECF No. 33-16 ("I, **Papu**, hereby grant to **Mirjam Letsch** (Photographer) . . . .").[5] And Letsch's re-mark that she had the model release "here with [her]" confirms that it preexisted any inquiry from Gypsy Kitchen and was thus not created in response to the inquiry. ECF No. 33-13. Moreover, in the rest of Letsch's response to the emailed question about a license, she repeatedly refers to the subject of her photo, a third party with whom she already has an agreement. *See id.* ("Or, if you would like to have an original [model release]: I am meeting her in the second week of April . . . . If you want, I can ask her to sign a model release with this photo?"). Finally, nothing in the record suggests that Defendants ever believed—until this litigation—that the model release contained the scope of the license. For these reasons, there is no reason to conclude that the model release defined the terms of the license, and its language does not expand the scope of the license Letsch conveyed to Defendants.[6]

---

[5] The model release also features a photo of the model and features the model's signature at the bottom, making Defendants' argument even more unconvincing. *See* ECF No. 33-16.

[6] In arguing for a broader license, Defendants also stress that Letsch permitted her photo to be used as a "permanent feature" in the Gypsy Kitchen. *See* ECF No. 33-1 at 21–22; ECF No. 33-7 ("[M]y architecture office would love to use this photograph as a *permanent large feature* (wall mural) . . . ." (emphasis added)). None of this changes the Court's conclusion about the scope of the license because it tracks the license Letsch provided—one that allowed her photo to be used as a *single* permanent feature within a *single* restaurant.

Defendants' communications with each other while planning the second Gypsy Kitchen years later confirm this conclusion.  Obviously, these communications themselves do not determine the scope of the license Letsch granted.  But they underscore the implausibility of Defendants' current position because they reveal how clearly the terms of their agreed-upon license, as set forth in the invoice, limited their use of Letsch's photo to one mural in one restaurant.  For example, when Hadermann was "unsure if we could use [the photo] again for DC," Heitler referenced the invoice and the model release, saying they led him "to believe we might need to reach out to them again to license it for another location." ECF No. 37-9 at 2–3.  In response, Hadermann did not refer to the model release, but seemed to tentatively adopt a broad interpretation of the limitation in the invoice.  *Id.* at 2 ("Haha, exactly, my interpretation is, it's still being used for a 'restaurant mural only':).").  Later, an RDstudio employee corresponded at length with Letsch to settle on a price for permission to use her photo a second time.  *See* ECF No. 37-14.  And after Hadermann instructed that Letsch be ignored, another RDstudio employee expressed concern that if the photo was copyrighted, using it a second time without permission would "expose[] RDstudio and SPH to a potential compliant [*sic*]." ECF No. 37-17 at 2.  Again, none of these communications determine the scope of the license, but they illustrate how unreasonable it is for Defendants, at this point, to turn around and argue that the *model release* set forth the license's material terms.

In short, Letsch granted a license for her photo to be used only once as a mural in a single restaurant.  That restaurant was Gypsy Kitchen's Atlanta location.  And these terms were memorialized in the invoice, which accurately reflected what the parties had agreed upon during Letsch's correspondence with an agent of SPHG.

In the alternative, Defendants argue that even if the invoice contained the terms of the license, the lack of a "condition precedent" in those terms means Letsch's remedy would be to

bring a breach-of-contract claim, not a copyright-infringement claim.  ECF No. 33-1 at 18–20.

Letsch disputes this, arguing that the license contains a condition precedent.  ECF No. 36 at 31–

34.  Once more, the Court agrees with Letsch.

"A copyright owner who grants a nonexclusive, limited license ordinarily waives the right

to sue licensees for copyright infringement, and [she] may sue only for breach of contract.  *MDY*

*Indus., LLC v. Blizzard Ent., Inc.*, 629 F.3d 928, 939 (9th Cir. 2010) (quoting *Sun Microsystems,*

*Inc. v. Microsoft Corp.*, 188 F.3d 1115, 1121 (9th Cir. 1999)).  "However, if the licensee acts

outside the scope of the license, the licensor may sue for copyright infringement." *Id.*  In copyright

law, "contractual terms that limit a license's scope [are] 'conditions,' the breach of which consti-

tute copyright infringement." *Id.*  "[A]ll other license terms [are] 'covenants,' the breach of which

is actionable only under contract law." *Id.*  The following example aptly illustrates the difference:

> [C]onsider a license in which the copyright owner grants a person the right to make
> one and only one copy of a book with the caveat that the licensee may not read the
> last ten pages.  Obviously, a licensee who made a hundred copies of the book would
> be liable for copyright infringement because the copying would violate the Copy-
> right Act's prohibition on reproduction and would exceed the scope of the license.
> Alternatively, if the licensee made a single copy of the book, but read the last ten
> pages, the only cause of action would be for breach of contract, because reading a
> book does not violate any right protected by copyright law.

*Storage Tech. Corp. v. Custom Hardware Eng'g & Consulting, Inc.*, 421 F.3d 1307, 1316 (Fed.

Cir. 2005).

"State law applies in determining whether a matter is a condition or a covenant."  *Yellow*

*Pages Photos, Inc. v. YP, LLC*, 856 F. App'x 846, 858 (11th Cir. 2021) (quoting *MDY Indus.*, 629

F.3d at 939).  Under Georgia law, "[a] condition precedent is one that must be performed before a

contract becomes absolute and obligatory upon the other party."  *Hall v. Ross*, 616 S.E.2d 145,

147 (Ga. Ct. App. 2005).  Conditions precedent are disfavored in interpreting contracts but "are

created by language such as 'on condition that,' 'if,' and 'provided,' or by explicit statements that

certain events are to be construed as conditions precedent." *Id.* (quoting *Choate Constr. Co. v. Ideal Elec. Contractors*, 541 S.E.2d 435, 438 (Ga. Ct. App. 2000)).[7]  The Court looks to the language of the agreement in making this determination. *Id.*

Here, the parties' agreement was formed through email correspondence and ultimately memorialized in the invoice.  Over email, the parties agreed on a limited license for Gypsy Kitchen to use Letsch's photo as a single restaurant mural.  And Letsch made clear that this limitation was a condition precedent when she wrote: "*If* you use my photo only for the 'mural' as specified by you . . . ."  ECF No 33-11 (emphasis added); *Hall*, 616 S.E.2d at 147 (listing "if" as a term that reflects a condition precedent).  The invoice likewise manifested a condition "the breach of which constitutes copyright infringement." *MDY Indus.*, 629 F.3d at 939.  The invoice's declaration that the photo was to be used as a "RESTAURANT MURAL (ONLY)" made plain that any use outside that scope violated the license. *See Universal Instruments Corp. v. Micro Sys. Eng'g Inc.*, 924 F.3d 32, 44 (2d Cir. 2019) ("[B]ecause copyright licenses prohibit any use not authorized, a licensee infringes the owner's copyright if its use exceeds the scope of its license.").  And the invoice stated, "[f]or all other use: please contact me first."  ECF No. 33-17.  All of this manifested an intent for Defendants to act before Letsch decided whether to extend the license, thereby constituting a condition precedent. *See Hall*, 616 S.E.2d at 147 (finding condition precedent where "[a] plain reading of this clause demonstrates that the parties intended that [the plaintiff] be given an

---

[7] The Court does not understand Georgia law to necessarily *require* the use of such language, only that such language can make plain a condition precedent. *Cf. Bank of N.Y. Mellon Tr. Co. v. Morgan Stanley Mortg. Cap., Inc.*, 821 F.3d 297, 305 (2d Cir. 2016) ("[S]pecific, talismanic words are not required.").

opportunity to find replacement clients before [the defendant] was entitled to deduct payments due").[8]

Thus, because the parties' agreement manifested a condition precedent, Letsch retains her claim for copyright infringement.

## 2.    Infringing Uses

Having established the scope of the license conveyed by the parties' agreement, the Court now considers whether, and to what extent, Defendants exceeded it.  The allegedly infringing uses fall into two categories: those uses associated with Gypsy Kitchen's second location in Washington, D.C. and those associated with its original Atlanta location.  On one hand, the Court finds that Defendants exceeded the scope of the license by using Letsch's photo in the D.C. restaurant.  On the other, the Court finds no infringement with respect to the digital and promotional uses associated with the Atlanta restaurant.

Begin with the use of Letsch's photo at Gypsy Kitchen's D.C. location.  That this use was improper flows straightforwardly from the Court's conclusion about the scope of the license. Letsch permitted her photo to be used as a single mural in a single restaurant: the Gypsy Kitchen in Atlanta.  And Defendants knew they were subject to that license because Letsch reminded them of it when she informed them that using her photo at the D.C. location was forbidden.  *See, e.g.*, ECF No. 33-19 ("[Y]ou have been given permission <u>only</u> for mural use in one restaurant.  Not for any other purpose, nor for new locations.").  But her photo hung in the lounge of the D.C. restaurant anyway.  *See* ECF No. 39-1 ¶ 97.  Indeed, at one point, RDstudio posted an image of the D.C.

---

[8] Defendants argue that there is no condition precedent because the language in the invoice "contemplates use of the Photograph for purposes other than a restaurant mural, but merely requests that Plaintiff Letsch be contacted in such event."  ECF No. 33-1 at 19.  Not so.  In context, the language in the invoice signifies that Letsch would have to agree to expand the scope of the license—not that further uses simply required notifying her.

location's interior, showcasing Letsch's unlicensed photo.  ECF No. 37-19.  These uses exceeded the scope of the license Letsch provided.

Things become trickier, however, when analyzing the allegedly improper uses at the Atlanta location.  Letsch maintains that her photo's improper use was "widespread," in that it was used "in myriad promotional and advertising materials."  ECF No. 36 at 40–41.  But however Defendants may have used her photo in their promotional materials, Letsch has not established that such uses were outside the scope of the license.  Indeed, there is no genuine dispute between the parties that Letsch's license, which allowed a single mural to be permanently displayed in a single restaurant, contemplated certain incidental uses of the photo.  For example, as Letsch herself conceded, the license naturally permitted Defendants to use a photo of the mural in advertising "as part of a larger image showing the interior of the Atlanta restaurant."  ECF No. 36 at 34–35.  And images of clients posing in front of Letsch's photo were likewise unobjectionable—consistent with Letsch's own understanding.  *See* ECF No. 33-5 at 15–16.  With these considerations in mind, most of the ways Defendants used images of the mural at the Atlanta location fall easily within the license.  *See, e.g.*, ECF Nos. 37-23, 37-24, 37-25, 37-27, 37-29.  The following are a few examples:







ECF Nos. 37-23, 37-24, 37-27.

At the same time, Letsch has provided a few examples in which the mural—or a portion of it—was a more specific focal point of an image used by Gypsy Kitchen.  Letsch objects to these kinds of uses.  *See* ECF No. 33-5 at 17 ("If this would be an image of just my photo or part of my photo, then no.").  But such uses were rare; among the only examples the Court found were these two:





ECF Nos. 37-26 at 8, 37-22.

These limited uses, even if outside the scope of the initial license Letsch conveyed, were justified here.  That is because, as Defendants argue, Letsch "ratified" such uses of her photo, thereby providing an implied license for her photo to be used in these ways.  *See* ECF No. 33-1 at 23–24.  "Because the existence of an implied license is an affirmative defense to infringement, the alleged infringers have the burden of establishing an implied license."  *Atkins v. Fischer*, 331 F.3d 988, 992 (D.C. Cir. 2003).  Defendants have met that burden here.  Specifically, no genuine dispute exists over whether Letsch directed the public to Gypsy Kitchen's social media advertising in a manner that manifested consent to show the mural as part of the interior of the restaurant, whether the mural was the focal point of the entire image or not.

For example, on March 21, 2020, Letch posted her photo on Instagram, accompanied by a caption explaining that it was recently "used as a mural in the @gypsykitchenatl restaurant."  ECF No. 33-20; ECF No. 39-1 ¶ 25.  And that tag—@gypsykitchenatl—takes a user to Gypsy Kitchen's own social media site.  *See* ECF No. 39-1 ¶ 25.  Letsch's caption also included a link to Letsch's public "Behance" profile.  ECF No. 33-20.  That profile, in turn, included an interior facility shot of Gypsy Kitchen that featured Letsch's photo as the focal point of the image.  *See* ECF No. 33-21 at 3–5.  "When an owner's conduct 'clearly' manifests 'a consent to . . . use' of copyrighted material, the owner impliedly grants a nonexclusive license."  *Midlevel U, Inc. v. ACI Info. Grp.*, 989 F.3d 1205, 1216 (11th Cir. 2021) (quoting *De Forest Radio Tel. Co. v. United States*, 273 U.S. 236, 241 (1927)).  That standard is met here.  "Because [Defendants] could reasonably interpret the plaintiff's conduct as the grant of a license for this use, [Defendants] succeed[] on [their] implied-license defense."  *Id.*  Letsch's conduct showed that she did not object to the use of such shots in Gypsy Kitchen's promotional materials and digital marketing.

For these reasons, the Court finds that there was no infringement with respect to uses of Letsch's photo at Gypsy Kitchen's Atlanta location. But the Court finds that Defendants exceeded the scope of the license with all their uses relating to Gypsy Kitchen's D.C. location.

### B.   Damages and Attorney's Fees

Having found summary judgment in Letsch's favor appropriate on liability to some extent, the Court now discusses her motion's request for summary judgment on damages and Defendants' request for summary judgment in their favor on attorney's fees.[9] The Court finds that Letsch may recover damages, even if it cannot decide the amount on summary judgment, and that Defendants are not entitled to attorney's fees.

### 1.   Actual Damages

Section 504(b) of the Copyright Act provides that a "copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages." This provision contemplates two categories of damages corresponding to the provision's two clauses. The first refers to actual damages and the second to the infringer's profits. *See Fitzgerald Pub. Co., Inc. v. Baylor Pub. Co., Inc.*, 807 F.2d 1110, 1118 (2d Cir. 1986) ("Congress made clear that the two subjects—profits and damages—are entirely separate.").

---

[9] Defendants correctly argue that "Plaintiff's claim for statutory damages under 17 U.S.C. § 504(c)(1) fails as a matter of law." ECF No. 33 at 1. They observe that a prerequisite for statutory damages under § 504 is that any copyright infringement must have "commenced after the first publication of the work and before the effective dates of its registration, unless such registration is made within three months after the first publication of the work." 17 U.S.C. § 412(2). But here, Letsch first published her photo on May 17, 2011, and did not register her copyright until February 17, 2021. ECF No. 39-1 ¶¶ 2–3. And Defendants' infringing activities began before Letsch registered her copyright. Moreover, Letsch herself concedes that statutory damages are inappropriate. *See* ECF No. 36 at 37 n.8. Thus, the Court agrees that statutory damages are unavailable.

The Court begins with the first half of 17 U.S.C. § 504(b): "actual damages suffered by [Letsch] as a result of the infringement."  In appropriate circumstances, these often include "the fair market value of a license covering the defendant's infringing use."  *On Davis v. The Gap, Inc.*, 246 F.3d 152, 172 (2d Cir. 2001).  Letsch argues that she is entitled to at least the €1,200 that she quoted for the use of her photo at Gypsy Kitchen's D.C. location.  ECF No. 36 at 37.  But she also argues that she would not have originally negotiated for less than €50,000 had she known that her photo "would become the publicity image of the entire restaurant" and used "in promotional materials, advertisements, on their website, and in the restaurant logo."  *Id.* at 38.  She notes that "she has granted licenses to commercial clients for much more limited use for as high as €18,000."  *Id.* For these reasons, Letsch moves for summary judgment on her contention that she is entitled to recover actual damages of €50,000.  ECF No. 35 at 2.

In response, Defendants argue that Letsch's "subjective assertion of actual damages is rank and unsupported speculation."  ECF No. 33-1 at 33.  They argue that Letsch's €50,000 fair-market-value estimate, which derives only from her deposition testimony, is not supported by "sufficiently concrete" evidence.  *See* ECF No. 39 at 19; *see also Bell v. Taylor*, 827 F.3d 699, 709 (7th Cir. 2016) ("[T]he price [the plaintiff] listed on his website is not sufficiently concrete to show the fair market value of his photo.").  And they also argue that her €1,200 quote does not establish a fair market value because Letsch has not proven that a willing buyer would have paid that amount. ECF No. 39 at 19.  For these reasons, Defendants suggest that Plaintiff's estimates are "based on undue speculation," *Bell*, 827 F.3d at 709, and that summary judgment in their favor on this point is therefore warranted, *see* ECF No. 33-1 at 33.

The Court finds that Letsch may recover actual damages for "the fair market value of a license covering [Defendants'] infringing use," which here includes the use associated with Gypsy

Kitchen's D.C. location, because there is sufficient evidence in the record from which an award may be determined. *On Davis*, 246 F.3d at 172. So while Defendants argue that Letsch's damages claims are only based on speculation, the Court disagrees. For example, Letsch quoted €1,200 as the fee to use her photo at the D.C. location. *See* ECF No. 37-14 at 4–5. True, "[w]ithout additional evidence, [Letsch's] subjective belief as to the fair market value of [her] photo is not enough to prove damages." *Bell*, 827 F.3d at 709; *see also On Davis*, 246 F.3d at 166 ("The question is not what the owner would have charged, but rather what is the fair market value."). But here, there is more. For example, although Gypsy Kitchen ultimately refused to pay the fee, the parties did appear to agree, at least at first, on the €1,200 figure. *See* ECF No. 37-14. Moreover, Letsch charged €1,000 for the original license to use her photo in Atlanta, which provides a data point for what a subsequent D.C. license might have cost. *See* ECF No. 36 at 38. And finally, Letsch also purports to have sold other limited licenses for as high as €18,000. *See id.* Though there may be some uncertainty about the *exact* amount of actual damages Letsch deserves, that does not categorically bar recovery in this case. *See On Davis*, 246 F.3d at 167 ("Given our long-held view that in assessing copyright damages 'courts must necessarily engage in some degree of speculation,' some difficulty in quantifying the damages attributable to the infringement should not bar recovery." (quoting *Stevens Linen Assocs. v. Mastercraft Corp.*, 656 F.2d 11, 14 (2d Cir. 1981))); *see also* 6 Patry on Copyright § 22:101 (Mar. 2024 update) ("In fixing the appropriate amount of damages, absolute precision is not required[;] some degree of speculation is permissible and no doubt inherent in the task.").

At the same time, the Court cannot decide on summary judgment the precise amount Letsch may recover because there is a genuine dispute of material fact as to that amount. Letsch argues that €50,000 is appropriate. But her basis for the €50,000 figure includes the allegedly infringing

uses associated with the Atlanta location, for which she has no right to recover.  *See* ECF No. 36 at 38 ("[H]ad she known that the Photograph would become the publicity image of the entire restaurant and used in publicity material of the restaurant she would not have negotiated for less than €50,000." (cleaned up)).  At the same time, Defendants do not concede that the much-lower €1,200 figure is appropriate, noting that they never paid that amount.  *Cf. Laspata DeCaro Studio Corp. v. Rimowa GmbH*, No. 16-cv-934 (LGS), 2018 WL 3059650, at *6 (S.D.N.Y. June 20, 2018) ("This argument does not challenge the sufficiency of Laspata's evidence of its actual damages. Rather, it is a factual dispute to be resolved by the jury in determining the amount of Laspata's actual damages.").  Given the positions of the parties, the "calculation of the appropriate fee is for the finder of fact at trial, and not for the Court on summary judgment."  *Silberman v. Innovation Luggage, Inc.*, No. 01-cv-7109 (GEL), 2003 WL 1787123, at *10 (S.D.N.Y. Apr. 3, 2003).

### 2.    Profits Attributable to Infringement

The second clause of 17 U.S.C. § 504(b) provides for recovery of "profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages."  This provision is less about making whole a copyright holder, and more about depriving "the infringer of the profits generated from infringement, in order to 'make[] clear that there is no gain to be made from taking someone else's intellectual property without their consent.'"  *Lerch Bates, Inc. v. Michael Blades & Assocs., Ltd.*, No. 20-CV-2223 (BAH), 2023 WL 6276643, at *13 (D.D.C. Sept. 26, 2023) (quoting *Dash v. Mayweather*, 731 F.3d 303, 311–12 (4th Cir. 2013)).

"[T]o survive summary judgment on a demand for indirect profits pursuant to § 504(b), a copyright holder must proffer sufficient non-speculative evidence to support a causal relationship between the infringement and the profits generated indirectly from such an infringement."  *Mackie v. Rieser*, 296 F.3d 909, 915–16 (9th Cir. 2002).  This causation element "'obviates a good deal of mischief' in claiming profits beyond what might be attributable to the infringement, without

diminishing the benefit § 504(b) confers on plaintiffs." *Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 711–12 (9th Cir. 2004) (citation omitted).   On the flip side, a *defendant* may "properly be awarded summary judgment with respect to any given revenue stream if either (1) there exists no conceivable connection between the infringement and those revenues; or (2) despite the existence of a conceivable connection, [the plaintiff] offer[s] only speculation as to the existence of a causal link between the infringement and the revenues." *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522–23 (4th Cir. 2003).

The Court finds that Letsch has satisfied her initial burden to establish an adequate causal nexus between (1) Defendants' infringement and (2) the Washington, D.C. restaurant's revenues during the period when Letsch's unlicensed photo was displayed there, which amounted to about $6.6 million. *See* ECF No. 39-1 ¶ 127.

In so finding, the Court is convinced by Letsch's argument "that Papu, the model in the Photograph," was effectively "*the* Gypsy of the 'Gypsy Kitchen' restaurant chain, and *literally the face of the brand*." ECF No. 36 at 42.   That is evident from Defendants' own conduct.   It is undisputed that Letsch's photo was used in both the Atlanta and D.C. locations and that it was displayed in various social media posts and promotional materials, mostly relating to the Atlanta location. *See, e.g.*, ECF No. 39-1 ¶¶ 100–05.   It is further undisputed that, in emails exchanged between Defendants about the D.C. location, they discussed how no other photo was "as impactful as the original gypsy image" and how "having the same gypsy image will help the brand" and "help tie the two locations together." *Id.* ¶ 89.   Hadermann himself testified that Letsch's photo is "a feature point that most people in the town recognize the restaurant by." *Id.* ¶ 128.   He elaborated that "people recognize this image, because it's on a huge wall in our restaurant," and that "these are touch points to get people . . . to connect with the restaurant." *Id.*

24

Before turning to the infringing use of the photo in the D.C. location, it bears noting that Letsch's photo was responsible for generating significant "buzz" about the Gypsy Kitchen in Atlanta. *See generally* ECF No. 37-44.  There, patrons took photos in front of the mural, and posted them on social media with captions like, "💛 this mural."  *Id.* at 5.  Tellingly, one user even commented that Letsch's photo represented "a great way to market when owning your business" because displaying such a unique mural "will attract people to take a picture and tag your business."  *Id.* at 7.  Although these remarks pertained to the Atlanta mural, they illustrate the power of Letsch's photo to attract customers—a power, it is reasonable to infer, translated at least to some extent to the D.C. location.[10]

Indeed, the record provides modest evidence that the improperly displayed D.C. mural— which was clearly visible to passers-by outside the restaurant—generated some "buzz" here too. One user on social media posted an interior shot of the D.C. lounge, which included the mural, and commented that it was her "new favorite place" and "the only place in Washington DC that remind[ed] [her] of #cdlcbarcelona."  ECF No. 37-19 at 4.  Another user commented on a different photo of the lounge, expressing admiration for the "picture on the wall," calling the interior "beautiful," and wishing for an end to the COVID-19 pandemic so that she "can come there" all the way "from Europe."  *See id.* at 6.  Other users commented "❤️wow" or "This painting 😍😍😍."  *Id.*

---

[10] Along these lines, Letsch has submitted evidence that, after SPHG began using images of the Atlanta mural on its website, the Atlanta location's revenues increased 20% compared to the equivalent period in the year before.  *See* ECF No. 33-23 at 12.  The Court is mindful that it has found that Defendants' digital and promotional uses of the Atlanta mural were not infringing and that similar uses of the D.C. mural were much more limited.  *See, e.g.*, ECF No. 37-19 at 5–6 (RDStudio social media posts depicting D.C. lounge).  Still, this revenue uptick in Atlanta reflects the power of Letsch's photo, and so it provides inferential support that the D.C. location's revenues were impacted, even if much more modestly, by the unauthorized presence of the photo.  *Cf.* ECF No. 33-23 at 9 (discussing the likelihood that the "unauthorized use of the Photograph as décor in GK D.C. had a similar effect on the GK D.C. business as the Mural did in GK Atlanta").

In addition, an industry magazine depicted the D.C. mural in a story on SPHG after that restaurant opened.  *See* ECF No. 37-30.  In short, all this demonstrates that Defendants' infringing use of Letsch's photo at D.C.'s Gypsy Kitchen can be plausibly tied to that restaurant's revenues, at least to some degree.

Other cases in which courts have found an acceptable causal nexus support this conclusion. Consider as an example *Andreas v. Volkswagen of Am., Inc*, 336 F.3d 789 (8th Cir. 2003).  That case involved an artist and author whose copyrighted poem was used in a widely aired car commercial.  *See id.* at 791–92.  An adequate causal nexus was established there because the "infringement was the centerpiece of a commercial that essentially showed nothing but the [advertised product]" and because "sales of the [product] during the period that the commercial aired were above [the manufacturer's] projections."  *Id.* at 797.  So too here.  Because Letsch's photo essentially served as a depiction of *the* gypsy of "Gypsy Kitchen," it functioned as "the centerpiece" of the restaurant's brand.  And there is some evidence in the record suggesting a link between the Gypsy Kitchen's profits and the use of Letsch's photo.[11]  So *Andreas* supports finding an acceptable causal link here.

Another case also provides support: *Garcia v. Coleman*, No. C-07-2279 (EMC), 2009 WL 799393 (N.D. Cal. Mar. 24, 2009).  *Garcia* involved a copyrighted photo displayed on the defendants' wine bottles.  *See id.* at *4.  The court there found a sufficient causal nexus because "consumers who bought the wine would have seen the copyrighted photograph on the bottle label," "the photograph was featured prominently on the label," and "the photograph, showing a mountain ridge in Sonoma, was inextricably linked to the brand of wine being sold by Defendants" such that it "was a graphic embodiment of the brand name."  *Id.* (citing *Polar Bear Prods., Inc. v. Timex*

---

[11] *See* note 10 above.

*Corp.*, 384 F.3d 700 (9th Cir. 2004)).  Likewise, Letsch's photo "was featured prominently" in both Gypsy Kitchen locations, and it "was inextricably linked to the brand" as *the* gypsy of the Gypsy Kitchen.  *Id.*  Defendants themselves referred to Letsch's photo as the "Gypsy Mural" or as the "gypsy image."  *E.g.*, ECF No. 39-1 ¶¶ 65, 89.  And they benefitted from a publication that depicted the interior of the D.C. location while it was improperly displaying Letsch's photo.  *See* ECF No. 37-30.  In these ways, Letsch's "Gypsy Mural" helped serve as "a graphic embodiment of the [Gypsy Kitchen] brand name."  *Garcia*, 2009 WL 799393, at *4.

Finally, *Silberman* also provides support.  *See* 2003 WL 1787123.  There, retail luggage stores displayed as interior décor an unauthorized reproduction of a photograph of the Manhattan skyline at dusk.  *Id.* at *1.  The court permitted the factfinder to calculate the amount of infringing profits, even while acknowledging that "it may well be that profits from the infringement are not great."  *Id.* at *10.  So too here.  Given the many factors that draw patrons to a restaurant, it may well be that the finder of fact will conclude Letsch's mural played a quite limited role—or even no role at all—in generating revenue for D.C.'s Gypsy Kitchen, and so the profits that can be attributed to the infringement are small to nonexistent.  But as in *Silberman*, "that calculation is . . . reserved for a trier of fact and is not appropriate for summary judgment."  *Id.*

Even some cases in which courts have *not* found an adequate causal nexus confirm that one exists here because of their differences with this case.  Consider two examples.  The first, *Bouchat*, 346 F.3d 514, involved an amateur artist who drew a winged shield as a logo for the NFL's Baltimore Ravens, *see id.* at 516.  The Ravens used the plaintiff's logo "as their primary identifying symbol" and "in every aspect of [their] activities, including uniforms, stationery, tickets, banners, on-field insignia, and merchandise."  *Id.* at 517.  But the court explained that "no reasonable trier of fact could find that the sale of a ticket, or of a sponsorship, or of broadcast rights

was in any way a consequence of the team's adoption of one logo design rather than another." *Id.* at 525 n.10. And that was because it "defies credulity that a consumer would purchase NFL trading cards in order to catch a glimpse of the . . . logo on a featured player's helmet; or video games, so as to see the logo on the simulated Ravens players; or a game program, simply because its artwork incorporated the [logo]." *Id.*

The second case, *Leonard v. Stemtech Int'l Inc.*, 834 F.3d 376 (3d Cir. 2016), involved a nutritional supplement wholesaler that used unlicensed copies of a photographer's copyrighted stem cell photos, *see id.* at 395. The plaintiff offered evidence that the wholesaler used the photos "to promote its brand, to promote understanding of its company and products, to train and recruit distributors and to provide those distributors with tools which were used to maximize [its] profits." *Id.* But "[n]one of this evidence show[ed] how or why [the plaintiff's] images, as opposed to other aspects of [the defendant's] marketing materials, influenced profits." *Id.* In other words, the plaintiff failed to "link customer decisions to purchase" specifically to his copyrighted photos, "as opposed to any other reason why a customer might purchase those products." *Id.*

Here, considering the entire record, it does not at all "def[y] credulity" that a consumer would dine at Gypsy Kitchen specifically because it incorporated Letsch's photo. *Bouchat*, 346 F.3d at 525 n.10. To the contrary, in the various ways described above, Letsch has "link[ed] customer decisions to" dine at Gypsy Kitchen to her copyrighted photo, "as opposed to any other reason why a customer" might dine at the restaurant.[12] *Leonard*, 834 F.3d at 395.

---

[12] This case is also unlike *Mackie*, 296 F.3d 909, which Defendants rely on. *See* ECF No. 33-1 at 24–25. *Mackie* involved the unauthorized reproduction of copyrighted artwork in a promotional campaign. 296 F.3d at 911. But there, the artwork was buried "on page twelve of [a twenty-four page] brochure." *Id.* at 912. Here, by contrast, Letsch has supported her assertion that her photo effectively served as the face of Gypsy Kitchen's brand, and that it was showcased in the D.C. restaurant. So the connection between an unauthorized use and the infringer's profits is far more attenuated in *Mackie* than the connection here.

Defendants argue that the revenue figure Letsch put forward is not "duly apportioned to the alleged infringement." *Stoliarov v. Marshmello Creative, LLC*, 19-cv-3934, 2021 WL 2514167, at *2 (C.D. Cal. Apr. 8, 2021). They accuse her of "merely 'toss[ing] up an undifferentiated gross revenue number.'" *Id.* (quoting *Polar Bear Prods.*, 384 F.3d at 711). But Defendants misunderstand Letsch's burden to put forth a "duly apportioned" figure at this stage. All Letsch must do is establish that the revenue figures she presents are "reasonably related" to the infringement. *See On Davis*, 246 F.3d at 160. She is "not required at this step to show that the infringement was the primary cause of [Defendants'] revenues, and a fair degree of inference is allowed." *Dash*, 731 F.3d at 330. Letsch puts forward undisputed evidence of the D.C. Gypsy Kitchen's gross revenue during the exact period in which her photo was wrongly displayed there. ECF No. 39-1 ¶ 127. In the Court's judgment, that is "duly apportioned" to the infringement. Specifically, it is sufficiently differentiated from other revenue streams not reasonably related to the infringement, such as revenue from the Atlanta Gypsy Kitchen restaurant, the D.C. location at other times, or even from SPHG's some twenty other restaurants.[13]

Defendants insist that Letsch must even *further* differentiate the revenue stream by providing evidence of *how much* of it could be attributed to the infringement. *See* ECF No. 39 at 17–18. Not so. Consider the following helpful analogy from the Second Circuit:

> [I]f a publisher published an anthology of poetry which contained a poem covered by the plaintiff's copyright, we do not think the plaintiff's statutory burden would be discharged by submitting the publisher's gross revenue resulting from its publication of hundreds of titles, including trade books, textbooks, cookbooks, etc. In our view, the owner's burden would require evidence of the revenues realized from the sale of the anthology containing the infringing poem. The publisher would then

---

[13] *Cf. On Davis* 246 F.3d at 161 ("Davis failed to discharge his burden by submitting The Gap, Inc.'s gross revenue of $1.668 billion—revenue derived in part from sales under other labels within the Gap, Inc.'s corporate family that were in no way promoted by the [infringing] advertisement, not to mention sales under the 'Gap' label of jeans, khakis, shirts, underwear, cosmetics, children's clothing, and infantwear.").

> bear the burden of proving its costs attributable to the anthology and the extent to
> which its profits from the sale of the anthology were attributable to factors other
> than the infringing poem, including particularly the other poems contained in the
> volume.  The point would be clearer still if the defendant publisher were part of a
> conglomerate corporation that also received income from agriculture, canning,
> shipping, and real estate development.

*On Davis*, 246 F.3d at 160.  Defendants' argument for even further differentiation is essentially akin to requiring the plaintiff poet above to prove, at this stage, what precise percentage of revenues from sales of the anthology were attributable to the copyrighted poem, and not to any of the other poems included in the anthology.  But there is a "distinction between what must be shown to demonstrate a causal link and what must be shown to rebut a defendant's argument that the revenues are not attributable to the infringement."  *Dash*, 731 F.3d at 331.  At summary judgment, to meet her burden, Letsch must only establish a sufficient causal link between the infringement and the profits generated indirectly from it.  She has done so.

With Letsch's burden met, "the *infringer* bears the burden of apportioning the profits that were not the result of infringement."  *Polar Bear Prods.*, 384 F.3d at 711 (emphasis added).  And Defendants have not really tried to do that.  To be sure, as noted above, "[i]n a case such as this, where defendants used the infringing [photo] as interior decor of their [restaurant], and did not sell the infringing [photo], it may well be that profits from the infringement are not great." *Silberman*, 2003 WL 1787123, at *10; *cf. Walker v. Forbes, Inc.*, 28 F.3d 409, 410–11 (4th Cir. 1994) (affirming award of three thirty-fifths of one percent of claimed revenues).  This is especially so given the many factors that impact restaurant revenues, as Letsch's expert's report acknowledges.  *See* ECF No. 33-23 at 15 (listing "food quality, service, atmosphere, and value" as relevant factors). But Letsch is "entitled to recover infringing profits *to the extent any such profits can be demonstrated*, and that calculation is also reserved for a trier of fact and is not appropriate for summary

judgment." *Silberman*, 2003 WL 1787123, at *10 (emphasis added); *see Andreas*, 336 F.3d at 798.

### 3.    Attorney's Fees

Defendants also move for summary judgment on attorney's fees, arguing that Letsch is not entitled to them because she is not the prevailing party. *See* ECF No. 33 at 2. They also move to receive their own attorney's fees, arguing that Letsch's claim "is objectively unreasonable, with no chance of success, and because such an award will have the effect of deterring others from filing similarly unreasonable claims." ECF No. 33-1 at 34 (citing *Prunty v. Vivendi*, 195 F. Supp. 3d 107, 111–12 (D.D.C. 2016)). The Court will deny summary judgment in these respects.

For the reasons discussed above, Letsch is the prevailing party as to liability. She has established that there is no genuine dispute of material fact that she granted a license to use her photo as a single mural in a single restaurant. Nor is there a genuine dispute that Defendants exceeded the scope of that license by displaying the photo in a second restaurant and publicizing that use. Indeed, in cases such as this, courts often award attorney's fees to the prevailing plaintiff. *See, e.g.*, *Harrison Music Corp. v. Tesfaye*, 293 F. Supp. 2d 80, 84–85 (D.D.C. 2003) (awarding attorney's fees where defendants "deliberately refused to comply with copyright laws" and "re-peatedly refused to purchase a license"). Thus, Letsch's claims are far from "objectively unrea-sonable, with no chance of success." ECF No. 33-1 at 34. An award of attorney's fees to Defend-ants is therefore unwarranted.

## IV.    Conclusion

For all the above reasons, the Court will grant in part Letsch's motion, as far as it seeks to establish Defendants' liability for copyright infringement related to the photo's use in Gypsy Kitchen's D.C. restaurant and her entitlement to actual damages and any profits related to that infringement. The Court will deny the motion as far as it seeks an exact amount of those damages,

and to the extent it seeks liability related to the photo's use in the Atlanta restaurant.  Conversely, the Court will grant in part Defendants' motion, to the extent it seeks to establish their lack of liability for infringement related to the photo's use in the Atlanta restaurant and as far as the motion seeks judgment on Letsch's request for statutory damages.  But the Court will otherwise deny Defendants' motion, including their request for attorney's fees.

A separate order will issue.

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: May 29, 2024